

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



```
———————————————————— x
CITY OF PONTIAC GENERAL            :
EMPLOYEES' RETIREMENT SYSTEM, On   :
Behalf of Itself and All Others Similarly :
Situated,                          :
                                   :
                    Plaintiff,     :
                                   :
        vs.                        :
                                   :
STRYKER CORPORATION, STEPHEN P.    :
MACMILLAN and DEAN H. BERGY,       :
                                   :
                    Defendants.    :
                                   :
———————————————————— x
```

Civil Action No.

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

**DEMAND FOR JURY TRIAL**



## NATURE OF THE ACTION

1.     This is a securities class action on behalf of purchasers of Stryker Corporation ("Stryker" or the "Company") common stock during the period from January 25, 2007 to November 13, 2008 (the "Class Period"), against Stryker and certain of Stryker's officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant Stryker is a medical technology company. Stryker manufactures and sells medical devices, primarily orthopaedic surgical implants, and medical equipment. In order to make the Company appear more profitable than it actually was, defendants cut corners on Stryker's operational costs, by failing to document and maintain adequate quality controls over the products it manufactured. The scheme: i) violated federal regulations regarding the manufacture of medical devices; ii) subjected the Company to unnecessary risks of sales disruptions, lower revenues and product liabilities due to product recalls; and iii) hid hundreds of millions of dollars of additional compliance costs both prior to and during the Class Period, allowing Defendants to falsely report and/or project 20%+ earnings growth for Stryker during 2006, 2007 and 2008. In the short-term defendants' scheme was highly successful, as reflected in the price of Stryker common stock which reached a 52-week high of $75 per share[1] in December 2007.

3.     The scheme began to unravel when Defendants announced in July 2008 that Stryker would incur at least $50 million in additional costs for the next several years in order to "revamp" the Company's compliance systems and procedures and resolve safety issues identified by the U.S. Food and Drug Administration ("FDA") inspections of Stryker's manufacturing facilities that dated back to October/November of 2006.

---

[1]     All share prices quoted have been split-adjusted.

4.      Throughout the Class Period, Defendants' statements in numerous SEC filings, press releases, news articles and analyst conferences were affirmatively false and misleading in failing to disclose the following facts which were then existing, known or recklessly disregarded by Defendants to be false, and necessary to be disclosed to make defendants' statements not misleading, including the following:

(a)      that the Company's manufacturing facilities, including Stryker's plants in Mahwah, New Jersey, Cork, Ireland and Hopkinton, Massachusetts were in material non-compliance with federal regulations regarding the manufacture and sale of medical devices, including Title 21, Code of Federal Regulations (C.F.R.), Part 820 -- the federal Quality System Regulation (21 CFR 820) which sets forth current good manufacturing practice ("GCMP") requirements;

(b)      that certain products, including medical devices, manufactured by Stryker were unsalable and subjected the Company to losses and risks caused by product recalls due to Stryker's failure to establish, document and/or maintain manufacturing systems and procedures designed to prevent and correct the production of nonconforming products and other quality problems in violation of GCMP requirements;

(c)      that "Hip Fracture Stems" manufactured by Stryker in its Cork, Ireland facility during 2006 were "adulterated" within the meaning of section 501(h) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §351(h)) and subject to recall, eroding the Company's revenues and causing material disruptions to the Company's sales processes;

(d)      that "Trident PSL" and "Hemispherical Acetabular Cups" manufactured by Stryker in its Cork, Ireland facility during 2007 were "adulterated" within the meaning of section 501(h) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §351(h)) and subject to recall, eroding the Company's revenues and causing material disruptions to the Company's sales processes;

(e)     that Stryker was on notice of material and continuing problems in the design and nonconforming production of its hip-replacement systems since at least January 2005 when it began receiving complaints from patients who had received the devices;

(f)     that Stryker had failed to establish and maintain an adequate organizational structure to ensure that its medical devices were designed and produced in accordance with GCMP requirements;

(g)     that Stryker's quality assurance and/or compliance units were severely understaffed causing Stryker to hire several hundred additional staff in order to ensure that its medical devices were designed and produced in accordance with GCMP requirements;

(h)     that Stryker's expenditures for quality assurance and compliance were materially underfunded causing the Company to incur at least $50 million in additional annual costs to ensure that its medical devices were designed and produced in accordance with GCMP requirements;

(i)     that Stryker's inventory reserves were materially understated by failing to account for obsolescent inventories resulting from product recalls, in violation of generally accepted accounting principles;

(j)     that Stryker's reported earnings, gross profits, and gross profit margins were materially overstated and could not be sustained because they did not include the true costs needed to ensure that the Company's medical devices were designed and produced in accordance with GCMP requirements; and

(k)     that Defendants' statements and opinions concerning Stryker's projected earnings, gross profits and/or gross profit margins were false when made because they did not

include the true costs needed to ensure that the Company's medical devices were designed and produced in accordance with GCMP requirements.

5.      Prior to the disclosure of these adverse events, Stryker insiders, including certain of the Individual Defendants (defined below), sold hundreds of thousands of their personally-held shares of Stryker common stock generating more than $300 million in illicit proceeds.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by Section 27 of the Exchange Act.

7.      Venue is proper pursuant to Section 27 of the Exchange Act as certain of the acts complained of herein took place in this District and Stryker common stock trades over the New York Stock Exchange which is located in this District.

## PARTIES

8.      Plaintiff City of Pontiac General Employees' Retirement System ("Plaintiff") purchased Stryker common stock as set forth in the certification attached hereto and incorporated herein by reference and was damaged thereby.

9.      Defendant Stryker manufactures and sells orthopaedic surgical implants and medical equipment.  The Company's headquarters are located at 2825 Airview Boulevard, Kalamazoo, Michigan. As of January 31, 2008, the Company had over 411,183,000 million shares issued and outstanding that trade on the New York Stock Exchange under the ticker symbol "SYK."

10.     Defendant Stephen P. MacMillan ("MacMillan") is, and was at all relevant times, Stryker's President, Chief Executive Officer ("CEO") and Director.

11.     Defendants Dean H. Bergy ("Bergy") was at all relevant times, Stryker's Chief Financial Officer ("CFO").  The Company announced Bergy's resignation in November 2008.

- 4 -

12.    Defendants MacMillan and Bergy are sometimes referred to as the "Individual Defendants."

## DEFENDANTS' SCIENTER

13.    Defendants are Stryker, its CEO and its CFO. Both of these executives, by virtue of their high-level positions with Stryker, directly participated in the management of Stryker, were directly involved in the day-to-day operations of Stryker at the highest levels and were privy to confidential proprietary information concerning Stryker and its business, operations, products, growth, financial statements and financial condition and were aware of or deliberately disregarded that the false and misleading statements made by and regarding the Company were still alive in the market and causing the Company's stock to trade at inflated prices. Because of their managerial positions with Stryker, each had access to the adverse undisclosed information about Stryker business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

14.    Each Individual Defendant was personally familiar with the quality of Stryker's projected earnings and additional costs excluded from those projections that the Company would incur in order to correct known deficiencies in Stryker's compliance systems and procedures because they monitored Stryker's compliance with FDA safety regulations, were aware of numerous product safety and manufacturing deficiencies identified by FDA safety inspections of Stryker's plants since at least October/November 2006 and closely monitored numerous customer/patient complaints concerning problems with certain of the Company's surgical implant products via reports from Stryker operations, sales and finance departments, which were generated and provided to them on a regular basis. The reports summarized the Company's current compliance and manufacturing systems and procedures, deficiencies in those systems and procedures identified both by the FDA

- 5 -

inspections and the Company's own investigations and estimated costs that Stryker would incur to

implement remedial measures. As a result of their monitoring, each of the Individual Defendants

knew, or recklessly disregarded that Stryker would be unable to meet its own projected sales targets

and financial results.

## FALSE AND MISLEADING STATEMENTS

15.    Defendant Stryker operates through two business segments – orthopaedic implants

and medical equipment. Historically, the Company derived approximately 60% of its revenues and

earnings from its orthopaedic implants segment.

16.    The Class Period begins on or about January 25, 2007, when Stryker issued a press

release announcing its operating results for the fourth quarter and year ended December 31, 2006.

The Company reported that sales of orthopaedic implants were $833.8 million for the fourth quarter

and $3,110.1 million for the year ended December 31, 2006, representing increases of 13.2% and

9.1%, respectively, due to higher shipments of reconstructive (hip, knee and shoulder), trauma,

spinal and craniomaxillofacial implant systems; bone cement; and the bone growth factor OP-1. The

Company also reported higher sales and shipments for its medical equipment segment. The press

release stated in pertinent part as follows:

> "Our unique set of businesses delivered a strong finish to 2006, especially in the
> U.S.," commented Stephen P. MacMillan, President and Chief Executive Officer.
> *"Our U.S. orthopaedic implant franchises were strong in the quarter, up 17%
> collectively*, and our global endoscopy business was up over 25% in the quarter
> behind a renewed product cycle."
>
>         *    *    *
>
> Net earnings for the fourth quarter of 2006 were $227.9 million, *representing a
> 27.7% increase* over net earnings of $178.4 million for the fourth quarter of 2005.
> Diluted net earnings per share for the fourth quarter of 2006 increased 27.9% to $.55
> compared to $.43 for the fourth quarter of 2005. Net earnings for the year ended
> December 31, 2006 were $777.7 million, representing a 20.8% increase over net
> earnings of $643.6 million for the year ended December 31, 2005. Diluted net

- 6 -

earnings per share for the year ended December 31, 2006 increased 20.4% to $1.89 compared to $1.57 for the year ended December 31, 2005.

*    *    *

The Company's outlook for 2007 continues to be optimistic regarding underlying growth rates in orthopaedic procedures and the Company's broadly based range of products in orthopaedics and other medical specialties, despite the potential for increased pricing pressure in certain markets. *The Company projects that diluted net earnings per share for 2007 will approximate $2.42, an increase of 20% over adjusted diluted net earnings per share of $2.02 in 2006.* The financial forecast for 2007 includes a constant currency net sales increase in the range of 11% to 13% as a result of growth in shipments of Orthopaedic Implants and MedSurg Equipment. If foreign currency exchange rates hold near current levels, the Company anticipates a favorable impact on net sales of approximately 1% to 2% in the first quarter of 2007 and a favorable impact on net sales of approximately 0% to 1% for the full year of 2007.

[Emphasis added.]

17.    On or about February 28, 2007, Stryker filed its annual report with the SEC on Form 10-K for the year ended December 31, 2006 ("2006 10-K"). The 2006 10-K, signed by Defendants MacMillan and Bergy, among others, reiterated the Company's previously announced financial results and included the following representations concerning Stryker's product inventories and reserves for product obsolescence, including losses for product recalls, stating in pertinent part as follows:

The Company maintains reserves for excess and obsolete inventory resulting from the potential inability to sell its products at prices in excess of current carrying costs. The markets in which the Company operates are highly competitive, and new products and surgical procedures are introduced on an ongoing basis. Such marketplace changes may cause some of the Company's products to become obsolete. The Company makes estimates regarding the future recoverability of the costs of these products and records a provision for excess and obsolete inventories based on historical experience, expiration of sterilization dates and expected future trends. If actual product life cycles, product demand or acceptance of new product introductions are less favorable than projected by management, additional inventory write-downs may be required, which could unfavorably affect future operating results.

*    *    *

- 7 -

Cost of sales represented 31.4% of sales in 2006 compared with 32.3% in 2005. *The lower cost of sales percentage in 2006 is primarily due to lower excess and obsolete inventory costs* as a result of fewer comparative product introductions during the year and reduced royalty costs related to the expiration of certain royalty agreements partially offset by faster sales growth in the lower margin MedSurg Equipment segment.

[Emphasis added.]

18.    On or about June 19, 2007, the director of the FDA's Office of Compliance for medical devices published a warning letter dated March 15, 2007, issued to the General Manager/Vice President of Stryker Ireland Ltd., which operates Stryker's orthopaedics manufacturing facility in Cork, Ireland. The warning letter, based on FDA inspections completed in November 2006, referred to several packaging issues and bioburden[2] problems. The letter cited missed deadlines to fix failures in following procedures for testing problematic products and documenting risk analysis, among other issues. The letter also cited several instances where the "root cause" of problems was not determined. Stryker did not issue any contemporaneous statements concerning the Cork Facility warning letter. However on or about July 20, 2007, an article entitled, "Stryker: Company Is in Compliance Following Warning Letter FDA" was published by *Device Daily Bulletin* stating in pertinent part as follows:

Following its response to an FDA warning letter regarding its manufacturing facility in Cork, Ireland, *Stryker considers its operations in full compliance with agency regulations, saying it has already employed the necessary corrective actions, the company told D&DL*.

The agency issued the letter March 15 [2007] to Stryker's Ireland operations following inspections Oct. 31 to Nov. 3, 2006. The facility primarily manufactures Duracon and Scorpio knee replacement components, as well as hip replacement

---

[2]    "Bioburden" refers to the presence of contaminating microorganisms in a certain amount of material. Bioburden or "microbial limit testing" is performed on pharmaceutical products and medical products as a quality control measure.

systems such as Trident Acetabular, according to the letter, which was posted recently to the FDA website.

Stryker was cited for not appropriately documenting the required elements of risk analysis and root cause investigations and verification or effectivity measures regarding a correction for a packaging procedure, the letter said. In addition, a root cause investigation was not initiated and corrective and preventive actions were not taken for a nonconformance of inner- and outer-blister test samples for lots of CoCr hip stems.

19.    On or about July 19, 2007, Stryker issued a press release announcing its operating results for the second quarter and six months ended June 30, 2007.  The Company reported net earnings growth in excess of 34% for 2007 compared to 2006, the press release stated in pertinent part as follows:

"We are encouraged to report accelerating growth rates for our Orthopaedic Implant and MedSurg franchises in both the United States and globally," commented Stephen P. MacMillan, President and Chief Executive Officer. "*Our U.S. orthopaedic implant businesses had a great quarter* with 17% collective growth and worldwide sales of Endoscopy and Instruments products were exceptionally strong with constant currency growth of 20% and 18%, respectively."

\*      \*      \*

Net earnings from continuing operations for the second quarter of 2007 were $240.1 million, representing a 13.2% increase over net earnings from continuing operations of $212.1 million for the second quarter of 2006. Diluted net earnings per share from continuing operations for the second quarter of 2007 increased 11.5% to $.58 compared to $.52 for the second quarter of 2006. *Net earnings from continuing operations for the first half of 2007 were $481.9 million, representing a 34.7% increase over net earnings from continuing operations of $357.7 million for the first half of 2006.* Diluted net earnings per share from continuing operations for the first half of 2007 increased 33.3% to $1.16 compared to $.87 for the first half of 2006.

\*      \*      \*

The Company's outlook for 2007 continues to be optimistic regarding underlying growth rates in orthopaedic procedures and sales growth rates in the Company's broadly based range of products in orthopaedics and other medical specialties, despite the potential for continued pricing pressure in certain markets. The Company projects that adjusted diluted net earnings per share from continuing operations for 2007 will approximate $2.40, an increase of 20% over adjusted diluted net earnings per share from continuing operations of $2.00 in 2006.

- 9 -

20.    Defendants' scheme to artificially improve the Company's reported financial results by cutting corners on Stryker's compliance costs was having its intended effect. On July 20, 2007, Stryker common stock closed at $66.20 per share, a 10.4 % increase from its price at the beginning of the Class Period.

21.    On or about October 17, 2007, Stryker issued a press release announcing its operating results for the third quarter and nine months ended September 30, 2007. The Company reported net earnings for the first nine months of 2007 increased by more than 30% compared to 2006, the press release stated in pertinent part as follows:

> "Our unique set of businesses and a strong focus on execution helped us deliver another excellent quarter," commented Stephen P. MacMillan, President and Chief Executive Officer. "Domestic sales were particularly strong, with Orthopaedic Implants growing 16% and MedSurg up 20%, while international sales growth accelerated to 11% operationally."
>
> *            *            *
>
> Net earnings from continuing operations for the first nine months of 2007 were $710.6 million, representing a 30.5% increase over net earnings from continuing operations of $544.7 million for the first nine months of 2006. Diluted net earnings per share from continuing operations for the first nine months of 2007 increased 28.8% to $1.70 compared to $1.32 for the first nine months of 2006.
>
> *            *            *
>
> The Company's outlook for 2007 continues to be optimistic regarding underlying growth rates in orthopaedic procedures and sales growth rates in the Company's broadly based range of products in orthopaedics and other medical specialties, despite the potential for continued pricing pressure in certain markets. ***The Company projects that adjusted diluted net earnings per share from continuing operations for 2007 will approximate $2.40, an increase of 20% over adjusted diluted net earnings per share from continuing operations of $2.00 in 2006.*** The latest financial forecast for 2007 includes a constant currency net sales increase in the range of 13.0% to 13.5%, up from the previous forecast of 12% to 13% growth, as a result of growth in shipments of Orthopaedic Implants and MedSurg Equipment. If foreign currency exchange rates hold near current levels, the Company anticipates a favorable impact on net sales of approximately 2.5% to 3.0% in the fourth quarter of 2007 and a favorable impact on net sales of approximately 2.1% to 2.3% for the full year of 2007.

- 10 -

[Emphasis added.]

22.    The statements set forth at ¶¶16-19 and 21 were affirmatively materially false and misleading in failing to disclose the following facts which were then existing, known or recklessly disregarded by defendants to be false, and necessary to be disclosed to make defendants' statements not misleading, including the following:

(a)    that the Company's manufacturing facilities, including Stryker's plants in Mahwah, New Jersey, Cork, Ireland and Hopkinton, Massachusetts were in material non-compliance with federal regulations regarding the manufacture and sale of medical devices, including Title 21, Code of Federal Regulations (C.F.R.), Part 820 -- the Federal Quality System Regulation (21 CFR 820) which sets forth current good manufacturing practice ("GCMP") requirements;

(b)    that certain products, including medical devices, manufactured by Stryker were unsalable and subjected the Company to losses and risks caused by product recalls due to Stryker's failure to establish, document and/or maintain manufacturing systems and procedures designed to prevent and correct the production of nonconforming products and other quality problems in violation of GCMP requirements;

(c)    that "Hip Fracture Stems" manufactured by Stryker in its Cork, Ireland facility during 2006 were "adulterated" within the meaning of section 501(h) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §351(h)) and subject to recall, eroding the Company's revenues and causing material disruptions to the Company's sales processes;

(d)    that "Trident PSL" and "Hemispherical Acetabular Cups" manufactured by Stryker in its Cork, Ireland facility during 2007 were "adulterated" within the meaning of section 501(h) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §351(h)) and subject to recall, eroding the Company's revenues and causing material disruptions to the Company's sales processes;

- 11 -

(e)    that Stryker was on notice of material and continuing problems in the design and nonconforming production of its hip-replacement systems since at least January 2005 when it began receiving complaints from patients who had received the devices;

(f)    that Stryker had failed to establish and maintain an adequate organizational structure to ensure that its medical devices were designed and produced in accordance with GCMP requirements;

(g)    that Stryker's quality assurance and/or compliance units were severely understaffed causing Stryker to hire several hundred additional staff in order to ensure that its medical devices were designed and produced in accordance with GCMP requirements;

(h)    that Stryker's expenditures for quality assurance and compliance were materially underfunded causing the Company to incur at least $50 million in additional annual costs to ensure that its medical devices were designed and produced in accordance with GCMP requirements;

(i)    that Stryker's inventory reserves were materially understated by failing to account for obsolescent inventories resulting from product recalls, in violation of generally accepted accounting principles;

(j)    that Stryker's reported earnings, gross profits, and gross profit margins were materially overstated and could not be sustained because they did not include the true costs needed to ensure that the Company's medical devices were designed and produced in accordance with GCMP requirements; and

(k)    that Defendants statements and opinions concerning Stryker's projected earnings, gross profits and/or gross profit margins were false when made because they did not

- 12 -

include the true costs needed to ensure that the Company's medical devices were designed and produced in accordance with GCMP requirements.

23.    On or about November 28, 2007, Stryker received a warning letter detailing numerous issues with the Company's orthopaedics manufacturing facility in Mahwah, New Jersey, citing bacterial contamination at the New Jersey plant. The FDA inspections identifying the problems were conducted over a six week period ending on July 12, 2007. The contamination included clusters of Staphylococcus bacteria, the pathogen that causes staph infections. The Director of the FDA's New Jersey district office indicated that Stryker's investigation to identify the root causes of the problems and its attempts to implement corrective actions were inadequate, violating the Federal Quality System Regulation (21 CFR 820). The FDA also stated that Stryker violated the Federal Corrections and Removals Regulation by failing to report to the FDA the removal of certain products from the market after the discovery of an operator's failure to inspect the product's dimensions resulting in the release of defective products to patients. In addition, the FDA warning letter indicated that Stryker has known of these problems since at least January 2005 when it began receiving complaints from patient recipients of certain hip implant products. Stryker did not disclose the receipt of the warning letter to investors.

24.    On or about January 22, 2008, Stryker issued a press release announcing that it was initiating a recall of all Trident hip implants manufactured at its Cork, Ireland facility. The Company also stated that it did not anticipate any material financial impact on Stryker's guidance for its 2008 results as a result of the recall. The press release stated in pertinent part as follows:

> KALAMAZOO, Mich., Jan. 22 /PRNewswire-FirstCall/ -- Stryker Corporation today issued the following statement in response to recent media attention regarding a Warning Letter dated November 28, 2007, that the United States Food and Drug Administration (FDA) published on its web site on January 15, 2008.
>
> While Stryker does not normally comment on discussions with the FDA, the Company believes it is obligated to provide additional information to healthcare

professionals, providers and patients in light of several media reports that draw erroneous conclusions surrounding the Warning Letter.

Most importantly, the Company does not believe there is any clinical evidence to indicate that the products mentioned in the Warning Letter present a safety issue to patients. Numerous published independent reports validate the long-term clinical performance of these products.

The Company takes these matters very seriously and has been cooperating fully with the FDA to address questions related to the FDA's observations of Stryker's internal process specifications. As part of a comprehensive review of internal processes following the FDA's observations, the Company conducted an investigation into a deviation from its internal specifications and processes for the Trident PSL and Hemispherical Acetabular Cups manufactured in its Cork, Ireland facility.

The internal investigation confirmed that all Trident Acetabular products manufactured in Cork, Ireland, have met all U.S. and international performance standards for sterility and biocompatibility. However, results from that testing indicated that the level of manufacturing residuals in some cases exceeded the Company's internal acceptance criteria. It is important to note this in no way impacts the product's sterility, nor product conformance to U.S. and international biocompatibility standards. As a result of the deviation from internal specifications, the Company is initiating a voluntary recall of Trident PSL and Hemispherical Acetabular Cups manufactured in its Cork facility. Medical ex-pert opinion of current and historical data concludes that there are no safety issues for patients who received these products. In fact, independent clinical evidence confirms that the performance of these cups compares very favorably with other high performing acetabular devices.(1,2,3)

Trident Acetabular Cups manufactured in the Company's Mahwah, New Jersey facility are not part of the voluntary recall and are still available to supply Stryker's customers.

The Company anticipates some short-term supply disruption as a result of this action and is focused on eliminating these disruptions as expeditiously as possible. In that regard, the manufacturing process for these cups in Cork has now been validated, product shipments have resumed and the Company has increased production at both the Mahwah and Cork facilities. Quality is a Stryker core value and the Company remains committed to developing, manufacturing and marketing medical products that are safe and effective and that comply with applicable laws and regulations, including those administered by the FDA and regulatory bodies in other countries in which Stryker conducts business.

The Company does not anticipate any material financial impact on Stryker's guidance for its 2008 results as a result of this voluntary recall. Details regarding the Company's sales and earnings outlook will be provided in conjunction with the release of its fourth quarter 2007 operating results on Wednesday, January 23, 2008.

25.    Following this announcement, the price of Stryker common stock declined by 10.6% from the closing price of $71.73 per share.

26.    The statements set forth in ¶25 were materially false and misleading as they continued to conceal the full extent and scope of the product recall and the costs Stryker would need to incur in order to implement the necessary remedial measures.

27.    On April 17, 2008, Stryker announced its operating results for the quarter ended March 31, 2008. During a conference call with analysts later that same day, Defendants MacMillan and Bergy revealed that the recall resulted in a revenue loss of $15 to $20 million during the first quarter and was expected to continue into the second quarter. In anticipation of weaker product sales Stryker common shares began a decline of nearly 5% on April 9, 2007, closing at $62.13 per share on April 13, 2008. Defendants, however, continued to conceal the true scope and extent of the problems at the Company.

28.    On or about May 2, 2008, Stryker revealed that the Company's problems with federal regulatory compliance extended beyond its orthopaedic manufacturing operations. Stryker departed from its previous practice of non-disclosure by announcing that Stryker had received a warning letter from the FDA concerning its biotech division. The Company also revealed that its ongoing compliance initiatives were being expanded to a company-wide "Quality Action Plan." Following this announcement Stryker common stock fell more than 5% closing at $61.51 per share on May 5, 2008.

29.    On July 17, 2008, Stryker announced its operating results for the quarter ended June 30, 2008. During a conference call with analysts later that same day, defendant MacMillan revealed for the first time that Stryker would incur at least $50 million in additional compliance costs annually for the next several years in order to bring its operations in compliance with federal

- 15 -

regulations. MacMillan further discussed the disruption to Stryker's sales force which impeded the highly anticipated rollout of the Company's hip resurfacing product causing further erosion in Stryker's 2008 revenue stream. Under questioning from analysts defendant Bergy further revealed that the Company's 2008 profit margins had been negatively impacted by additional compliance costs incurred to date. Following these statements the price of Stryker common declined 5.6% to close at $63.91 per share on July 21, 2008. Yet, Defendants continued to conceal the full extent of the problems at the Company.

30.    On October 17, 2008, Stryker announced its operating results for the quarter ended September 30, 2008. During a conference call with analysts that same day defendant MacMillan revealed that Stryker could no longer commit to 20% earnings growth targets due in material part to the anticipated increase in compliance costs. Following these statements the price of Stryker common stock declined 13% to close at $47.14 per share on October 24, 2008.

31.    Then, on November 13, 2008, the last day of the Class Period, during an investor conference hosted by Credit Suisse, Stryker revealed that its was still losing revenues and customers as a result of the January 2008 hip product recall. Following these statements Stryker common stock declined 23% closing at $36.11 per share on November 20, 2008.

## CLASS ACTION ALLEGATIONS

32.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Stryker publicly traded securities on the open market during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of Stryker's and their families and affiliates.

33.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to

- 16 -

the parties and the Court. During the Class Period, Stryker's had over 56.9 million shares of stock outstanding, owned by thousands of persons.

34.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Exchange Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    The extent of damage sustained by Class members and the appropriate measure of damages.

## LOSS CAUSATION/ECONOMIC HARM

35.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Stryker stock and operated as a fraud or deceit on Class Period purchasers of Stryker stock by misrepresenting the Company's business success and future business prospects. When defendants' falsehoods, misrepresentations and omissions were disclosed and became apparent, the price of Stryker stock price fell as the prior artificial inflation came out of the stock. As a result of their purchases of Stryker common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

36.    Defendants' false and misleading statements and omissions had the intended effect and caused Stryker's stock to trade at artificially inflated levels throughout the Class Period,

reaching a Class Period high of $75.39 per share on December 26, 2007, before collapsing to $36.11 per share on November 20, 2008, – a 52% decline.

37.    The declines in the price of Stryker stock detailed herein were a direct result of the nature and extent of defendants' fraud being revealed through a series of disclosures to investors and the market. The timing and magnitude of the declines in the price of Stryker stock price negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Stryker's stock price and the subsequent significant decline in the value of Stryker's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

38.    Plaintiff incorporates ¶¶1-37 by reference.

39.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

40.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 18 -

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Stryker's publicly traded securities during the Class Period.

41.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Stryker common stock. Plaintiff and the Class would not have purchased Stryker common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

42.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Stryker common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against All Defendants

43.    Plaintiff incorporates ¶¶1-42 by reference.

44.    The Individual Defendants acted as controlling persons of Stryker within the meaning of Section 20(a) of the Exchange Act. By reason of their positions as officers and/or directors of Stryker, and their ownership of Stryker stock, the Individual Defendants had the power and authority to cause Stryker to engage in the wrongful conduct complained of herein. Stryker controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding plaintiff and other members of the Class damages together with interest thereon;

C.    Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.    Awarding plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 15, 2010

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS, LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

SAMUEL H. RUDMAN

58 So. Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI 48075-1000
Telephone: 248/746-0700
248/746-2760 (fax)

Attorneys for Plaintiff

- 20 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Patel v. Parnes*, No. 2:07-cv-05364-MMM(SHx) (C.D. Cal.)
*Waterford Township Gen. Employees Ret. System v. CompuCredit Corp., et al.*, No. 1:08-cv-2270-TWT (N.D. Ga.)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*In re Schering-Plough Corporation/Enhance Sec. Litig.*, No. 2:08-cv-00397-DMC-MF (D.N.J.)
*In re TETRA Technologies, Inc. Sec. Litig.*, No. 4:08-cv-00965 (S.D. Tex.)
*In re NVIDIA Corporation Sec. Litig.*, No. 5:08-cv-04260-JW (N.D. Cal.)
*City of Pontiac General Employees' Retirement System v. CBS Corporation et al.*, No. 08-cv-10816 (S.D.N.Y.)
*City of Pontiac General Employees' Retirement System v. Immucor, Inc., et al.*, No. 1:09-cv-02351-TWT (N.D. Ga.)

STRYKER

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15ᵗʰ day of JANUARY , 2010.

CITY OF PONTIAC GENERAL
EMPLOYEES' RETIREMENT SYSTEM

By: _____

Its:  CHAIRMAN _____

- 2 -

STRYKER

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 10/11/2007 | 4,900 | $73.13 |
| 11/27/2007 | 2,051 | $70.51 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 10/12/2007 | 4,900 | $73.39 |